Good morning, Your Honors. Stephen Rennick for the appellants Edgar and Reynoso. Could I reserve five minutes for rebuttal? Yes, you may. Please watch your clock. Thank you. At issue here is a very narrow question, whether or not two officers involved in this overall incident that involved a number of them are entitled to qualified immunity, and specifically whether or not the actions that have been challenged by the plaintiff violate clearly established law. And as we've briefed, our argument is no, it did not. There are two issues that the plaintiff has raised, the issue of alleged excessive force and the claim that there was a failure to obtain appropriate medical care. Regarding the excessive force, the case that the plaintiffs rely on is Drummond. All of the other cases that they cite to ultimately come back to Drummond. And so that's the key issue here, whether or not Drummond on its face could be said to provide clearly established law that the actions of these deputies, excuse me, these officers on this occasion violated the provisions that were set out in Drummond. One major difference as a practical matter between this case and Drummond is there's a videotape. We know exactly what happened. We saw it from three different angles, from three different officers' body-worn cameras. And they show a very different sort of scenario than in Drummond. One of the major factors that we discussed in our briefing is that a major factor that the court in Drummond repeatedly focused on was that the suspect was repeatedly saying, I can't breathe. He was pleading for air. He was making it abundantly clear that he could not breathe. But counsel, if we take the facts in the light most favorable to Perkins, he was already unconscious so we couldn't say he couldn't breathe. I, again, if you look at the videotape, you have him taking actions. He had muscle convulsions. Well, I don't know that what we saw would qualify as convulsions if Your Honor is saying that we have to take that interpretation. Well, I mean, we have to look at the facts in the light most favorable to Perkins on the motion for summary judgment. Well, the other, in terms of Drummond and the pleading for air, if you generalize that a little bit, it's was it clear that there was a problem with the suspect being able to breathe? But isn't that a question of fact for the jury? Not if it's clear from the videotape that he was breathing. And the other aspect about Drummond is that, if I may, the language, the description of the incident in Drummond is that the two officers in that case put their full body weight on Mr. Drummond, literally crushed him to the ground. In this case, we have videotapes showing that one officer had his knee on the right shoulder of Mr. Perkins, and another officer had his knee periodically, not constantly, but periodically, just above the hip area of Mr. Perkins. At no point is there anybody pushing down, as was the case in Drummond, on the upper torso and neck. And so, Drummond is... Your adversary seems to, certainly in the briefing and so on, say to the opposite. Is it a question of us looking at the video and determining what we see there? And as part of that question, could you help me, and I'll ask your adversaries as well, there's something that goes on before they start to try to hobble him, isn't there? So, are there two things to look at? One is what goes on when they're, quote, trying to calm him down, and then when they actually start the hobbling. Are you referring with what you just said only to the first time? Or help me there. I'm actually referring to the second time. I don't recall... Well, to answer the basic question, in... I apologize. My notes are a little sketchy. In Scott v. Heinrich, not... I apologize. The Supreme Court in the Sacramento case was very clear. They talked about the Court of Appeal should have looked at the videotape, not taken what the parties described as having happened. When there's a videotape, the videotape is the ultimate light in which the incident is to be viewed. That's what Justice Scalia said. That's Scott v. Harris you're talking about? Yes, thank you. And in this case, whatever the plaintiff may say about them believing that people were on top of Mr. Perkins' back, there literally is nothing in the videotape that supports that. The only thing that the videotape shows is a knee on the right shoulder and a periodic knee above the hip area. At one brief point, the officer straddles Mr. Perkins, so it's a little different than a knee. But that's for, like, 20 seconds or so. But other than that, that's the entirety of the pressure on Mr. Perkins' back. That's what the video shows, and there is no uncertainty about that. That all occurs during the hobbling process. If you look at the videotape, there is no incident prior to the hobbling where there's pressure on his back. Most of the time, he's on his side. Most of the time, you hear the officers saying, you know, lay on your side, be on your side. They turn him on his side. Periodically, he rolls onto his stomach. But at no point during that entire process is there any pressure being put on his back. That's what the videotape shows. You're saying that even when they take his legs up, bring them up behind his buttocks, doesn't that put pressure on his body, his breathing? Well, it puts pressure on his lower body. But you can see during the videotape him breathing. You can see, if you look at his hands, you can see them going up and down. And it's not a shallow breath. You can see significant movement, you know, that's showing. So your view of the videotape is that any stopping of breathing is only after he's rolled back up? They refer to it as turning blue. In the videotape, there are only two points at which you can see Mr. Perkins' face. In the first one, his face looks perfectly normal. You see his face about a minute later. And then while I wouldn't say it looks blue, they may, and, you know, if we're going to look at this in the light most favorable, fine. But that's already, there's about a minute between those two views of his face. Halfway between that is when the officers say, wait, is he breathing? Does he have a pulse? They started taking action because they were concerned about his condition. That's 30 seconds after his face is not blue. They start. Did you say that when they rolled him back forward? And then, so 30 seconds after they begin being concerned, they roll him to his side, and that's where you see his face again, and arguably it looks blue, which is not surprising if at that point, and again, if you look at the video, that 30 seconds before the blue face is when you stop seeing the movement that I described earlier, where he seems to stop breathing. And so the videotape is showing officers responding to a change in his condition, acting appropriately to that change in condition, checking his condition, checking his pulse. When they discover that he's not breathing, they roll him over. If they see his face is blue at that point, they see his face is blue. They immediately go to their car to get medical equipment, and they start treating him. This is not Drummond. This is not a case where you have two officers just putting their full body weight on top of a suspect and ignoring everything else that's going on. There is no case law that comes close factually to what they did on this particular incident, and the Supreme Court has made very clear that specificity is crucial in Fourth Amendment cases such as this, and that's not here. I see that I've gone past my ten minutes. Just very briefly on the medical attention issue, there is no case law that says that would have put these officers on notice that they needed to go out and bring the paramedics to him when the paramedics were on the scene and they were waiting for them to treat him, nor did they need to take affirmative action to inform paramedics who weren't treating Mr. Perkins at that moment about aspects of him. There is no case law to that effect. Unless the Court has questions, I'd like to reserve the remainder of my time. Thank you, Counsel. Thank you, Your Honor. Good morning. May it please the Court, I'm Ayanna Curry representing Justin Perkins' family. I wanted to start with the question that the Court asked us at the onset of the notice of appeal was filed, and the Court asked us whether you even have jurisdiction. And I submit to you what we just heard, trying to convince you of what the video shows, shows very well that there are questions of fact. Yes, you're supposed to take what the video shows, but if there are varying interpretations of what you see, that is also an issue of fact that must be decided by a jury. To me, the import of Drummond is this Court acknowledging that you can kill somebody via a prone restraint. If you have them on their stomach and they've already exerted, they've already been subject to multiple forms of force, and then you get them on their stomach and put weight on their back, you can kill a person that way. Drummond is this Court recognizing that that's called deadly force. And that's just one of many. Now you have to look at the factors and balance all the rest of the factors that Graham has you considering, whether that force was reasonable. I just feel like every point we just heard about is a question of fact. Were they on notice? To me, in Drummond, those officers were on notice because the suspect was telling them, I can't breathe, I can't breathe. And as this Court noted, well, Justin Perkins was not in a position to advocate for himself. He was barely conscious. He was foaming at the mouth. He had been subject to multiple taser deployments and multiple carotid holds. And this is where the city of Anaheim's training of these officers is vital to the question of the notice that these officers had. These officers, especially in Anaheim, are specifically and especially trained on restraint asphyxia because Drummond was also a city of Anaheim case. So these officers know, actually, if you have successfully applied a carotid hold to a suspect, they're not supposed to be in a prone restraint ever. And there's also in the officers' training. So is that exactly when the constitutional violation occurs, when they do something that is not on their training? It's a factor. You're not the person who applied the carotid hold. They do know about it. They do know about it. They're on notice. They're on notice of all the uses of force that Justin was subjected to. In the briefing, we didn't hear any of that during argument, but in the briefing they say, well, his heaving could have just been from strenuous activity. That's a question of fact. Yes, the jury could find, oh, yeah, he was just in a fight, so of course he's breathing heavy. But is not following your training with no indication of animus, is that enough to be deliberate indifference? You just add that in. No, it's not enough. I don't want to speak over you. No, it's not enough, and I don't want to pretend like that's what I'm saying. It's a factor, and it's one of many factors that I think the other decisional law that we cite give hold. Like the notion of hobbling restraint and putting somebody's legs. Now there's a tremendous amount of force, especially like somebody with Justin who had a big stomach. That's also in the officer's training. If you've got a big stomach, you put them on their stomach, you can't breathe. Help me on the facts here because there's so many depositions and statements. I had some trouble. The image that I have, and help me here, is that they walk him out. There's difficulty. He gets down to the ground, and then he starts I guess what I would characterize as flailing, whether it's convulsions or voluntary movement, but there's some flailing. And is it that there's some kind of restraint before we get into what I call the hobbling? And the reason I especially ask that is it's relevant to me, to the paramedics in your medical claim. The image I have, and tell me if this is fair, is that there's something going on on the ground, and the paramedics walk this way, and then they walk back, and after that the hobbling starts. Is that fair or not? Because your brief at 9 says they applied their combined weight for several minutes, and during this time a paramedic walks past. Is that during the hobbling or is that before the hobbling? I don't have a specific recollection of when the paramedics passed. Maybe you can give me his. Go ahead. If you don't have an immediate answer, go ahead. But I will submit to you, and our pathologist is going to explain to the jury, that Justin's respiratory distress started from the taser, started from the carotid hole. Okay, but these officers can't be constitutionally liable at that point. But they knew about it. They knew about it, but the question is what did they do or not do that passed the line from negligence, from maybe good practice to a constitutional violation? Is it when they walked him out at all? Have they violated the Constitution then? Is it when they put him on the ground? Is it when they start the hobbling? I think all of it. I think all of the above. I think they were not supposed to move him from the spot that they found him in, and I think they take a magnanimous. So that's back in the hallway. Right. Here are stairs. Justin is initially here. They're not on the stairs. They're under the stairs.  They try to walk him, and he can only manage to get to in front of the stairs. So at that point, is that the medical claim or is that the excessive force? At what point is the excessive force? I think the excessive force is the totality of everything that they did, and it culminates here. I feel like he was not breathing well. And certainly the hobble and the amount of pressure they put on him to put the hobble, but he was already not breathing before then. And the video shows we get a small glimpse into Justin turning blue. You don't just turn blue. You start pink and red and then purple and then blue. So we're supposed to pretend that these officers didn't see all of that distress up until he turned blue, where now there's effectively no oxygen. All of this will be explained to the jury through our pathologist. Because what's happening is human physiology. I don't know if I stop at Judge Boggs. If I stop at where they were under the stairs, maybe that's negligence. But he was living under the stairs. He might still be with us there. This is what killed him, what happened in front of the stairs. And I just think it was a culmination of all of it. In terms of... Do you guys have any other questions for me? Okay, I want to briefly talk about the 14th Amendment and the medical claim. It's not just that they didn't tell these paramedics, hey, this guy is suffering. They did all the affirmative acts to compile what had already happened to him through the tasering and the carotid, and then they take their steps to asphyxiate him. But they also claim that Justin grabbed our guns, or he tried to grab at us. They were laughing and obviously not scared or felt threatened by any gesture that he made. He was handcuffed. He was, like I said, barely conscious, drooling at the mouth, and in no position to offer meaningful resistance, which is what the cases that cite Drummond say. There's no resistance in Drummond. But even in Drummond, I'm sure the officer said that there was resistance. What you had to accept as fact in Drummond was the witness accounts that he wasn't resisting. Other courts have interpreted that to mean meaningful, even in this court, meaningful resistance. Okay, who knows if he was actually grabbing for the gun. I question what was he going to do with it, even if he did grab the gun. But a jury could find that maybe he was trying to communicate. He was on the way to falling. Maybe he was trying to steady himself. The kicking and the flailing that you mentioned, other courts have found that to be means of communication, bucking for lack of air. All of that happened before the hobbling. So these are all just questions that a jury has to decide. We're trying to figure it out, and it's not our place to do that at this stage. Well, that was the reason I was asking you about a specific point, and you've given the answer that you don't need that because at the point of deciding to apply the hobble, the alternative is to leave him flailing, right? I mean, or should they have done something else at that point from an excessive force point of view? Did they say, okay, he's flailing, we'll just step back and watch it? No, like I said, I agree. I don't think they ever should have moved him. He was alive and breathing over here. So now that you totally contributed to his deterioration and made his situation even worse, I guess we don't know. If they had stopped pushing down on him, maybe he would have stopped kicking because then he would have been able to breathe. I don't know the answer to that question. The only point I'm making about the 14th Amendment is that when they told their supervisor, oh, he tried to grab our gun, that's when the decision was made to put him in the hobble. And they affirmatively made his situation worse and allowed a medic to walk by them twice without telling them, oh, you know, this guy was tased, he had two carotid holds, he's not looking good. I think that's akin, that's exactly like Maxwell. There was help, there were paramedics there to help, and the officers took affirmative actions that prevented that help from getting to the suspect that was on the scene. Unless there are any other questions from me, we will defer to our briefing on this. Thank you. Thank you, counsel. Thank you, Your Honors. Just to quickly respond to some of the points made by poison counsel, she commented that the officers prevented the paramedics from treating Mr. Perkins. That ignores a certain fundamental aspect here. Mr. Perkins was not the only person injured in this incident, and that was Mr. Perkins' actions, not anybody else's. There was two other officers who had been involved in a fight, one who had part of his finger bitten off. The paramedics were not there simply to deal with Mr. Perkins. This is not a situation where they were involved. Isn't that also an issue of fact for the jury? Not on qualified immunity. The question becomes, is their case law saying that what they did on that occasion violated clearly established law? I'm not aware of any case that has been cited here that even has the same scenario as paramedics not being called attention to a particular individual who needs medical care at a multi-victim scene. There's nothing like that. There is nothing that would have put these two officers on notice that they needed to tell the paramedics, no, you have to treat Mr. Perkins right now. Forget everybody else. It's not your call. We've decided you're going to treat him now. There's nothing like that. Whether that would have been a better idea, whether that, you know, Judge Boggs talked about best practices, that's not the issue here. We're talking about qualified immunity and clearly established law. And nothing on the medical side comes close factually, which is what the Supreme Court has said. It doesn't have to be identical, but it's got to at least be in the ballpark. And this isn't. The other thing I'd like to point out is as counsel presented their basic theory of the case, which is he shouldn't have been moved from under the stairs. And that's fine. They can take that position. But, again, there's no case law that says that they couldn't move him as a matter of constitutional law. If you look at the videotape and you listen, when they moved him, Officer Edgar says, hey, can you get up, Justin? Can you walk with us to the paramedics? They moved him to get him closer to where the paramedics would be. That's exactly what we would want officers to be doing. If they can get someone to where they can get medical attention, I would think we would want that to happen. This is not a case of someone who obviously could not be moved. He was breathing. He was at least semi-conscious. He was responding at least to one question, which they say he couldn't answer the other ones. But the man was not in a situation where any movement was obviously going to harm him. And so when they talk about the totality of what happened as being the problem here, that's not a constitutional violation by these particular two officers. Nothing that they did on this incident, in their particular area of what they did, crossed the line. And on that, we would submit. Could I just ask one final question? Sure. What became of Officers Wang and Lee? Are they still in the litigation somewhere? Yes. They were part of the summary judgment motion. We did not appeal from the denial of the summary judgment motion. And actually, Officers Edgar and Reynoso are still in on state law claims. So we are literally talking the very narrow issue of qualified immunity. So Wang and Lee are still in this? Yes. Okay, thank you. Thank you very much, Your Honor. Thank you, Counsel. Perkins v. Edgar will be submitted.
judges: Boggs, WARDLAW, IKUTA